**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Case No.: 23-CR-227(JEB)** |
|  | **:** |  |
| **v.** | **:** |  |
|  | **:** |  |
| **JEFFREY REED,** | **:** |  |
|  | **:** |  |
| **Defendant.** | **:** |  |
|  | **:** |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeffrey Reed to 42 months of incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $170 for his convictions. This recommendation falls at the midpoint of the defendant's sentencing range as calculated by the government.

## I.    INTRODUCTION

Following a bench trial, this Court convicted Proud Boy member and Three Percenter Jeffrey Reed of interfering, obstructing, or impeding police officers on January 6, 2021, along with four accompanying misdemeanor charges. Before January 6, Reed joined with fellow Proud Boys to coordinate and plan the actions of the group on that day; they would meet at 10 a.m. on January 6 and head towards the Capitol. Reed complied with directives and, after joining the group of Proud Boys on the morning of January 6, assumed an active role in breaching several barricades blocking access to the Capitol building. With Reed at the front, the crowd breached the initial

barricades at Peace Circle—a pivotal breach in the riot—and gained access to the walkway to the Capitol. Reed cleared a bike rack from the walkway, moved over a fence and through police officers, and forcefully ripped a bike rack from the hands of a police officer—all before entering the Capitol building. Reed spewed vitriol at overwhelmed officers, yelling "You work for us!" and calling them "fucking oathbreakers!"

Once inside the building, Reed quickly moved to the prominent locations, making his way to the House Chamber—where the certification of the electoral college vote had been taking place—and later the House Speaker's Lobby—nearby the evacuation of lawmakers fleeing from the riot. Reed remained in the Capitol building for 23 minutes. Even after leaving, he remained on Capitol grounds, contributing to the continued necessity of the emergency lockdown inside the Capitol, as he emphatically ripped and littered a "Blue Lives Matter" flag and later occupied the roof of a tactical government vehicle.

The government recommends that the Court sentence Reed to 42 months of incarceration for his convictions, which reflects the gravity of his conduct on January 6.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The Court is well-aware of the general background of the January 6, 2021 attack on the Capitol, and thus the government refers the Court to that general background here: ECF No. 1-1.

### B.    Jeffrey Reed's Role in the January 6, 2021 Attack on the Capitol

#### Reed's Membership in the Proud Boys and the Three Percenters

On January 6, 2021, Reed was a member of the Proud Boys. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the

modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events in which some members engage in violence. There is an initiation process for new members of the Proud Boys, and members attending public events often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans.

Throughout the United States, there are local Proud Boys chapters, which are typically led by chapter "presidents." Each chapter has a degree of autonomy: the president of a local chapter governs that chapter in its geographic location. On January 6, 2021, Reed was a member of the "Proud Boys' Hudson Valley, New York chapter."

On January 6, 2021, Reed was also a member of another group, the "Three Percenters" (also called "III%" or "3%" or "Threepers"), based on their view that only three percent of American colonists took up arms against the British during the American Revolution. Some Three Percenters liken the present-day U.S. Government to British authorities that infringed on civil liberties of the colonists in the period leading up to and during the American Revolution. Many independent or multi-state militia groups incorporate "III%" in their unit names. *See also* PSR ¶ 82, n.4.

### *Planning For January 6, 2021*

In late November 2020, Reed attended a rally with the Proud Boys in Washington, D.C. He sent a text message stating that he traveled for this occasion to "fight[] ANTIFA and BLM." Around this same time, Reed also explained in a text message that "[w]e are in a war and I need warriors."

On December 19, 2020, then-President Trump announced plans for a "Stop the Steal" rally event in Washington, D.C., on January 6, 2021, which date coincided with Congress's Certification

of the Electoral College vote. Enrique Tarrio, the national chairman of the Proud Boys organization and a handful of other members of the Proud Boys created a new chapter that would consist of members from across the country. The new chapter was referred to as the Ministry of Self Defense or MOSD and was comprised of "hand selected members" and described as a "national rally planning" chapter.

On January 5, 2021, Reed was added to a private Telegram message group named "Boots on Ground," initiated for Proud Boys who had traveled to Washington, D.C. for January 6. In the afternoon of January 5, MOSD leader Joe Biggs posted a message to the Boots on Ground group thread that read, "Just trying to get our numbers. So we can plan accordingly for tonight and go over tomorrow's plan." Reed responded shortly after, complaining about the lack of organization: "This is so unorganized! Where is our order?" and "No fucking support so far" and "no fuckin plan either." Biggs responded, "We are trying to avoid getting into any shit tonight. Tomorrow's the day." Several hours later, the members of the chat were instructed to meet the following day at the Washington Monument at 10 a.m. and not to wear Proud Boys colors. The instruction provided that "details" would be laid out at the pre-meeting.

***Reed's Actions on January 6, 2021***

Consistent with the instruction in the group chat, on the morning of January 6, 2021, a group of more than 100 Proud Boys, including Reed, met near the Washington Monument at 10 a.m. As instructed, none of the men were dressed in Proud Boys colors of black and yellow. Reed dressed in a black sweatshirt with white writing that said, "The Trumps America's First Family," brown boots, and jeans, and he carried a radio.

4



*Image 1: Screenshot of video footage showing Reed on January 6, 2021
holding a radio that he brought to the Capitol.*

As the group convened, a participant in the Boots on Ground chat wrote, "Storming the capital building right now!!" Shortly after 10 a.m., the group began to march away from the Washington Monument and the nearby speeches at the Ellipse and headed east toward the U.S. Capitol.



*Images 2 & 3: Screenshots of video footage showing Reed (red rectangle) marching towards the Capitol with the Proud Boys on the morning of January 6, 2021.*

As they marched toward the Capitol, Proud Boys leaders addressed the group through a megaphone—stating that the police and government had failed them. As the group walked past

the west side of the Capitol at approximately 11:20 a.m., one leader announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . . Let us remind those who have forgotten what that means."

A few minutes later, as the group marched past a group of U.S. Capitol Police (USCP) officers, Biggs gave the officers the middle finger and the men marching with Biggs taunted them, yelling "treason," and warning the officers, "don't make us go against you."

The group, including Reed, continued to the east side of the Capitol. As the group stood on the east side of the Capitol, a Proud Boys member named Daniel Lyons Scott yelled out, "let's take the fucking Capitol!"



*Image 4: Screenshot of video footage showing Reed (red rectangle) on the east side of the Capitol with the Proud Boys on the morning of January 6, 2021.*

Shortly before noon, the group marched back to the west side of the Capitol to a group of food trucks located near the intersection of 2nd Street and Constitution Avenue N.W. There, the group stopped and waited for approximately thirty minutes. At approximately 12:45 p.m., fifteen

minutes before the certification of the Electoral College vote was scheduled to start, the group marched back towards the Capitol.

The Proud Boys, including Reed, arrived at the Peace Circle, at the edge of the restricted portion of the Capitol grounds, at approximately 12:50 p.m. The First Street pedestrian entrance to the Capitol, which was approximately 100 feet away, was guarded by a handful of USCP officers. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board."

Upon arriving at the Peace Circle, the group chanted things like "USA!" and "Whose Capitol? Our Capitol!" At 12:53 p.m., the crowd surged forward towards the barricades.

 

*Images 5 & 6: Screenshots of video footage showing Reed (red rectangle) peering ahead towards the Capitol building, left, as the officers stood guard behind fencing and AREA CLOSED signs (blue rectangle), right.*

**Breach Point One:** As the crowd stopped at the barricades, Reed quickly made his way from the middle of the large crowd to the front. At the front line, the crowd yelled demeaning remarks and threats at the officers and began rocking and shoving the metal bike rack barricades. One rioter near Reed grabbed and attacked a USCP officer.

7





*Images 7 & 8: Screenshots of video footage showing a rioter attacking a police officer (blue rectangle, top) and, shortly after, the mob pushing through the barricades with Reed at the front (red rectangle, bottom).*

As the crowd started to push through the barricades, the police officers were in an increasingly precarious position with stairs at their back and an angry mob at their front. Reed and the crowd surged forward.



*Image 9: Screenshot of video footage showing Reed (red square)
pushing forward through the barricades with the crowd*

As the crowd plowed through the barricades, the outnumbered police officers turned and quickly retreated, sprinting back towards the Capitol building to form a new police line. At about 12:54 p.m., with Reed at the forefront, the crowd stormed forward into the restricted perimeter. With a sense of urgency, Reed jogged toward the Capitol.




*Images 10 & 11: Screenshots of video footage showing Reed (red rectangle) rushing forward
towards the Capitol building after the crowd broke through the first barricades.*

**Breach Point Two:** After the retreating officers reached a backup line of barricades, they reformed their line. However, the mob quickly took control of the barricades and pulled them away

from the police officers. For his part, Reed grabbed one of the bike racks and moved it off the

pathway and out of the officers' reach, effectively disarming officers of a critical defensive tool

and clearing a path forward for the crowd.

**Breach Point Three:** After Reed made it past the second line of police officers and

barricades, he moved towards the west plaza. A black fence spanned the west plaza from north to

south. USCP officers, who were increasingly outnumbered and had now been twice overrun by

the crowd, fell back behind the black fence to reinforce the line.

By 12:57 p.m., Reed approached the fence and the officers.



*Images 12 & 13: Screenshots of video footage showing the west front as the crowd initially started to occupy it, left, and Reed (red rectangle), right, on the west front approaching the black fence.*

As Reed approached the police officers, he pointed his finger at the officers' faces and

yelled, "YOU WORK FOR US!"



*Image 14: Screenshot of video footage showing Reed (red square) pointing at police officers as he yells at them.*

Despite the more permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd quickly pushed through and over the fence and stormed forward towards the front of the plaza. Reed was one of the first rioters who breached this fence.



*Image 15: Screenshot of Capitol surveillance footage (zoomed up) showing the crowd overrunning the barricades on the west front and Reed (red circle) moving forward at the front of the crowd.*

After being overrun again, police officers sprinted to the northwest and southwest staircases to block the crowd's access to the upper terrace access points to the Capitol building. Reed jogged across the west front towards the southwest staircase.



*Image 16: Screenshot of Capitol surveillance footage (zoomed up) showing Reed (red circle) running across the west front towards the southwest staircase.*

**Breach Point Four:** By the time Reed reached the staircase, at about 12:59 p.m., police officers had formed another line, again with supporting bike rack barricades, in front of the southwest staircase. The crowd yanked the bike racks away from the officers and pushed into them.





*Images 17 & 18: Screenshots of Capitol surveillance footage (zoomed up) and a 3D rendering of the Capitol showing the crowd pulling away bike racks (blue rectangle) from the police line.*

Reed, again at the front of the line, grabbed a bike rack and attempted to wrestle it away from a police officer. In that tug-of-war, Reed aggressively rocked his body back-and-forth as he forcefully yanked the bike rack from a USCP officer's grip. With one final violent pull, Reed ripped the bike rack from the officer's hands, causing the officer to fall on the ground.



*Image 19: Screenshot of video footage showing Reed (red outline and red triangle) forcibly pulling in a tug-of-war movement as he ripped a bike rack away and ultimately caused a police officer (blue outline and blue rectangle) to fall to the ground.*

At that point, nearby USCP Officer Cruz recognized that the fallen officer was in danger. Officer Cruz stepped in front of the fallen officer to protect him. At trial, Officer Cruz explained that this was a dangerous situation for the officer on the ground because of the unruly crowd in front of him and the officer's position on the ground. Trial Transcript at 113 (9/16/24) (Officer Cruz: "[H]e was in a position of disadvantage and with the crowd and some of the previous actions of the crowd, you know, had to make sure he could get up safely and not be attacked.").

Shortly after, the Metropolitan Police Department (MPD) was called to assist the USCP. Once the MPD officers arrived, they reformed a bike rack barricade across the west plaza and pushed the crowd back behind the barricades. Standing near the front of the crowd of thousands of individuals, Reed watched as rioters continued to attack police officers. At one point, Reed watched as several nearby rioters forcefully pulled officers into the crowd as they fought over control of a bike rack.



*Images 20 & 21: Screenshots of video footage showing Reed (red rectangle) watching rioters fight with police officers, left, and rioters attempting to forcefully remove bike rack barricades from police officers, right.*

As the fighting between the mob and the officers continued, Reed reapproached a line of police officers near the southwest stairs and beligerently yelled at the officers, calling them "fucking oathbreakers!"

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the west front and a general retreat was called.

After the fall of the police line, Reed quickly made it to the upper west terrace. At 2:26 p.m., just thirteen minutes after the initial breach of the Capitol building, Reed entered the building through the Senate Wing Door with sirens blaring overhead and broken glass littering the floor on his left and right.



*Image 22: Screenshot of Capitol surveillance footage showing Reed entering the Capitol building through the Senate Wing Door on January 6, 2021.*

Reed marched down the hall and entered the Crypt. Once in the center of the building, Reed ascended to the second floor and entered the Rotunda. Reed walked around the Rotunda, checking each of the doorways and smoking what appeared to be a cigarette.



*Image 23: Screenshot of Capitol surveillance footage showing Reed (red rectangle) walking throughout the Rotunda and smoking.*

Reed walked through one doorway in the Rotunda and moved towards the House of Representatives' Chamber. As he marched towards the chamber through Statuary Hall, rioters chanted "STOP THE STEAL!"

A line of police officers had formed in front of the Chamber. Rioters, Reed included, filled the room outside of the chamber and quickly grew to outnumber the officers. The mob surged forward through the police line and rushed towards the Chamber.



*Image 24: Screenshot of Capitol surveillance footage showing Reed (red square)*
*with the crowd outside the House of Representatives' Chamber shortly before*
*this crowd breached the police line.*

While members of the crowd attempted to breach the House Chamber, Reed continued down the hall, moving directly towards the House of Representatives' Speaker's Lobby. Just on the other side of the Speaker's Lobby door, lawmakers attempted to evacuate the increasingly dangerous scene. Around this time, one rioter was wounded by a police gunshot. As USCP officers who responded to the crisis attempted lifesaving procedures on this individual, officers repeatedly ordered other rioters in the area to leave. Officers yelled, "Space! Just give us space right now!" and "Get the fuck back . . . get out!" During this critical time, Reed ignored the officer's commands and remained in the vicinity on his cell phone.



*Image 25: Screenshot of video footage showing Reed (red circle) outside the Speaker's Lobby.*

Eventually, Reed moved away from the Speaker's Lobby. Around that time, a reinforcement of police officers arrived and temporarily regained control of the area. They pushed the rioters, Reed included, out of the building. Reed exited the Capitol at 2:49 p.m. on the east side of the building, 23 minutes after his entry.

Reed remained on the Capitol building steps. Just minutes after he was forced out of the building, he ripped up a "Blue Lives Matter" flag. Other rioters in the area celebrated as Reed threw the flag piece by piece over the edge of the staircase. One nearby rioter recorded Reed's actions and yelled, "Oh he's throwing up the thin blue line. That's right! Oh – yes! They're the tyrants! . . . Fuck the thin blue line!"





*Images 26 & 27: Screenshots of video footage and a 3D rendering of the Capitol showing Reed (red rectangle) ripping and throwing a "Blue Lives Matter" flag.*

Reed remained on the east side of Capitol grounds for at least another hour. He later climbed onto and occupied a tactical government vehicle as he watched the chaos in the area continue to unfold.



*Images 28 & 29: Screenshots from video footage showing Reed (red rectangle) occupying a government vehicle during the riot.*

In May 2021, when one of Reed's contacts sent him a text message about a political issue

in the news, Reed replied, "those dumb mother fuckers gonna make everyone return to DC again but with guns this time."

### III.    THE CHARGES AND TRIAL

On July 12, 2023, a federal grand jury returned an indictment charging Reed with five counts: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(G).

On September 18, 2024, following a bench trial, this Court convicted Reed of those five offenses.

### IV.    STATUTORY PENALTIES

Reed now faces sentencing on the five counts of conviction. As noted by the Presentence Report issued by the U.S. Probation Office, Reed up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and restitution for the § 231(a)(3) conviction alone, and a mandatory special assessment of $170 for all five counts. PSR at ¶¶ 120, 127, 143, 146, 149-151.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The appropriate guideline analysis for each count is listed below:

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | +3[1] |
| U.S.S.G. § 2A2.4(c)(1) | Cross Reference | |
| U.S.S.G. § 2A2.2(a) | Aggravated Assault Base Level | 14 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
| | **Total** | **20** |

Count Two: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
|---|---|---|
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Grounds or Building | 2 |
| U.S.S.G. § 2B2.3(c)(1) | Cross Reference | |
| U.S.S.G. § 2A2.2(a) | Aggravated Assault Base Level | 14 |
| | **Total** | **14** |

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4(1) | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2B2.4(b)(1)(A) | Physical Contact | 3 |
| U.S.S.G. § 2B2.3(c)(1) | Cross Reference | |
| U.S.S.G. § 2A2.2(a) | Aggravated Assault Base Level | 14 |
| | **Total** | **14** |

*Application of 2A2.2 in Count One:* The government submits that U.S.S.G. § 2A2.2 is the correct guideline for calculating the defendant's offense level for Count One, 18 U.S.C. § 231(a)(3), obstructing, impeding, or interfering with law enforcement. Reed's conduct

---

[1] Reed's conduct constitutes "physical contact," when he, with his "knees bent and arms out . . . engag[ed] in a forceful tug of war over a bike rack with a police officer, ultimately ending as the defendant's final yank caused an officer to fall to the ground." *See* ECF No. 62 at 3-4 (Court agreeing with the government's recitation of facts, finding it "is accurate."). Physical contact need not be direct and encompasses indirect uses of force. *See, e.g.*, *United States v. Taliaferro,* 211 F.3d 412, 415-16 (7th Cir. 2000) (specific offense characteristics properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton,* 431 F. Supp. 2d 675, 675-77 (E.D. Texas 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd,* 230 F. App'x 457 (5th Cir. 2007).

on the west front at breach point four qualifies as an assault and an "Aggravated Assault" under U.S.S.G. §2A2.4(c). Thus, the appropriate guideline is § 2A2.2, rather than § 2A2.4. *See, e.g.*, *United States v. Sargent*, 21-cr-639 (DLF) (applying U.S.S.G. § 2A2.2 to a Section 231 conviction); *United States v. Baquero*, 21-cr-702 (JEB) (same); *United States v. Blair*, 21-cr-186 (CRC) (same).

Section 2A2.4(c) is a cross-reference to § 2A2.2, which applies "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to all relevant conduct for the offense, not simply the conduct for which the defendant was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387-88 (D.C. Cir. 1997). Section 2A2.2, in turn, defines "aggravated assault" as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1.

Here, (D) is applicable. First, Reed's actions during breach point four constitute felonious assault. The Guidelines do not define "assault" or "felonious assault." Sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "**a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm**.") (citations omitted, emphasis added); *Lucas v. United*

*States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979).

Here, as this Court found, Reed "yank[ed] and pull[ed] on the bike rack by the inaugural stage," Trial Transcript at 48 (9/18/2024) ("Verdict"), and "forcefully shoved the bike racks at the officers," ECF No. 62 at 4, ultimately causing an officer to fall down and be "in reasonable fear of his safety," Verdict at 51; *see also* ECF No. 62 at 3-4 (agreeing with the following recitation of fact: Reed made physical contact with an officer when he engaged with an officer physically "with his knees bent and arms out engaging in a forceful tug of war over a bike rack with a police officer, ultimately ending as the defendant's final yank caused an officer to fall to the ground."). An officer at trial credibly testified that this officer being knocked to the ground constituted a danger to his safety, because the officer "was in a position of disadvantage and with the crowd." Trial Transcript at 113 (9/16/24). Thus, the defendant's conduct involved an assault.

Furthermore, Reed's conduct constituted a felonious assault because it involved physical contact. *See* 18 U.S.C. § 111(a)(2) (punishing § 111 assaults as felonies where the assault involved physical contact).

Second, the felonious assault constitutes an "aggravated assault" for purposes of the sentencing guidelines because Reed intended to commit another felony; here, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

*Zero Point Offender:* Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria, including

that the "defendant did not use violence or credible threats of violence in connection with the offense."

Here, § 4C1.1 does not apply because Reed used violence or a credible threat of violence against police officers on January 6, including when he joined the pack of rioters and stormed through the bike rack barricades near Peace Circle and later when he forcefully yanked away a bike rack barricade, causing a police officer to fall to the ground. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (explaining that violence is "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm").

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[2]

*Grouping:* Under U.S.S.G. §3D1.2, "closely related counts" group if they "involve the same victim and two or more acts or transactions connected by a common criminal objective," among other criteria for grouping. U.S.S.G. § 3D1.2(b).

Counts 2 and 3 group because they involve the same victim, Congress. *See* U.S.S.G. § 3D1.2(b). Count 1 involves a distinct victim – the police officers on the west front whom Reed obstructed, impeded, and interfered with. Also, although Counts 2 and 3 cross-reference to the

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that, for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

guideline for Count 1 pursuant to U.S.S.G. § 2B2.3(c)(1), these counts do not group pursuant to U.S.S.G. § 3D1.2(c), as the commentary explains that "[a] cross reference to another offense guideline does not constitute 'a specific offense characteristic . . . or other adjustment' within the meaning of" § 3D1.2(c). *See* U.S.S.G. § 3D1.2(c), cmt., n.5.

That leaves two groups:

Group One: Count 1 (highest offense level 20)
Group Two: Counts 2 and 3 (highest offense level 14)

Under U.S.S.G. § 3D1.4(a) and (b), one unit would be given for Group One as the group with the highest offense level, and one-half unit would be given for Group Two, as it is six levels less serious than Group Two. Per U.S.S.G. § 3D1.4, 1 ½ units adds one offense level to the group with the highest offense level, making the combined offense level 21.

*Criminal History Category:* The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 65.

Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 21, Reed's Guidelines imprisonment range is 37 to 46 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

Reed's role in the January 6 attack merits a significant term of incarceration. As a member of the Proud Boys, Reed was privy to, and participated in, preplanning of the events of that day. Unlike many, Reed did not arrive in Washington, D.C. for the rally; instead, he met with Proud Boys first thing in the morning and marched to the Capitol. Shortly after Reed was added to the

"Boots on Ground" messaging thread, he repeatedly demanded to know "the plan," and, after it was announced to meet at the Washington Monument at 10 a.m. on January 6, he abided. Reed's coordination with other Proud Boys leading up to and on January 6 is a highly aggravating factor. *United States v. Speed,* 22-cr-244 (TNM), Sent. Tr. at 37 (Judge McFadden: "the violence, the planning, and the extremist intentions" of the Proud Boys make a defendant's association on January 6 an aggravating factor); *United States v. Fonticoba*, 21-cr-638 (TJK), Sent. Tr. at 62 ("[Y]ou were part of a 100-man-strong fighting force that circled the Capitol. You were present at a number of the key moments.").

On January 6, Reed marched with the Proud Boys to the Capitol, the designated target, and placed himself at the forefront of the initial breach of Capitol grounds, making Reed one of the first rioters on restricted grounds. Reed was one of the few individuals brazen enough to directly confront and engage with police officers, surging through the outer barricades and opening the path for thousands behind—a pivotal moment in the riot that day. *See United States v. Leyden*, 22-cr-314 (TNM), Sent. Tr. at 35 (Judge McFadden: the barrier at Peace Circle "was by no means foolproof, [but] for the moment it was sufficient to keep [the crowd] from entering the restricted area around the capitol. It also gave the officer some protective distance from the rioters. And it served to clearly warn protestors they could go no further. Had it remained, I have no doubt that most protestors would not have gone to the trouble and danger of trying to scale it. In short, the breach of the Capitol would have looked very different."). Reed's later breaches, including when he removed a bike rack from the pathway and when he forcibly ripped a bike rack away from police officers, and that he jogged to each next location, demonstrate his commitment to making it into the Capitol.

And once inside the Capitol, Reed moved directly to the secure locations of the building where Congress was scheduled to certify the election results. And he was in the group that outnumbered and overwhelmed officers near the House Chambers.

On January 6, Reed was determined and aggressive. No matter what barrier he faced, Reed was unrelenting in his efforts to gain access to the Capitol. The nature and circumstances of his actions warrant a significant term of incarceration.

**B.  Reed's History and Characteristics**

Reed is a 49-year-old ironworker who lives in Texas. PSR ¶ 100. He is currently employed and has consistently maintained employment throughout his adulthood. *See* PSR ¶¶ 103-107. Reed is divorced and has two children, ages 15 and 17. Reed has not seen either of his children in over a year; both children with live their mother, Reed's ex-wife, who also currently has no contact with Reed. PSR ¶¶ 75-76.

Reed has two marijuana possession convictions, PSR ¶¶ 62-63, and one reckless driving conviction after he drove under the influence of liquor, PSR ¶ 64. Those convictions are too old to count towards criminal history points.

At least as late as January 6, 2021, Reed was a member of the Three Percenters, an extremist group. Reed informed the Probation Office that, since 2021, he has stopped active membership. However, he has not been cooperative with the Probation Office in providing information regarding this affiliation. *See* PSR ¶ 82. Reed has a tattoo of "III%" on four knuckles on both of his hands.



Reed was also a member of the Proud Boys on January 6. Reed stated in a text message shortly after the Capitol riot that he was no longer a member of the Proud Boys after seeing an article circulated suggesting that one of the leaders of the group was an undercover FBI agent. His current affiliation is unknown.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Reed's criminal conduct on January 6 was the epitome of disrespect for the law.

### C.   The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence:* A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence:* Specific deterrence here is warranted. As of the date of this filing, Reed has not expressed remorse, contrition, or demonstrated an understanding of the impact of his actions or the actions of the group that he aligned with.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Fonticoba*, 21-cr-638 (TJK), the defendant was a member of the Proud Boys and was extensively involved in planning and organizing the attack on the Capitol in advance of January 6. Fonticoba believed the election was stolen and, as part of the MOSD message thread, he and other Proud Boys discussed plans to storm the Capitol building. On January 6, Fonticoba joined the group of Proud Boys at the Washington Monument and marched to and around the Capitol. As he marched with the Proud Boys, Fonticoba recruited another Proud Boy to join the

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

group. Fonticoba was at the initial Peace Circle breach and among the first group of rioters that forced their way through the outer police lines and onto Capitol grounds. Then, after reaching the west front, two other Proud Boys tore down a section of the black metal fence on the west front and, after the fence had broken loose from the post, Fonticoba assisted in pulling it to the ground. After the police line fell on the west front, Fonticoba joined a stack of Proud Boys and moved up the stairs toward the Capitol building. Fonticoba entered the Capitol building at 2:14 p.m. and remained inside for less than 90 seconds. Shortly after exiting the building and Capitol grounds, Fonticoba proudly reported back to other Proud Boys, "We just stormed the capital [sic]." Fonticoba posted on social media celebrating the riot and attempted to place blame on the government. Judge Kelly sentenced Fonticoba to 48 months of incarceration following his convictions of Civil Disorder (18 U.S.C. § 231(a)(3)) and Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)).[5]

Reed and Fonticoba were in the same Proud Boys' "Boots on Ground" message thread ahead of January 6; they both received and abided by the same orders to meet and march with Proud Boys to the Capitol on the morning of January 6. Once at the Capitol, although Fonticoba's actions were similar to Reed's, Reed's were more aggravating. Whereas Fonticoba was involved in two pivotal breaches (Peace Circle and the black fence), Reed was involved in four (Peace Circle, second barricade line on Pennsylvania Avenue, black fence, and by the southwest

---

[5] Fonticoba was sentenced prior to the Supreme Court's opinion in *United States v. Fischer*, 144 S. Ct. 2176 (2024). Fonticoba was sentenced on his two counts of conviction: Section 231 and Section 1512(c)(2). However, Judge Kelly stated that his sentence would be the same, even if the Section 1512(c)(2) conviction did not stand. *See* Sent. Tr. at 66 ("This would be my sentence, even if Count Two [Section 231] was the only count of conviction here."). Thus, this case remains an appropriate comparator post-*Fischer*.

staircase). And Reed took a more active role at the breach points. For example, whereas Fonticoba was part of the pack that confronted and overran police officers at Peace Circle, he was in the middle of the crowd, but Reed was on the front lines directly plowing through the barricades. Like Fonticoba at the black fence, Reed moved a bike rack barricade on Pennsylvania Avenue and created a more accessible pathway for the crowd behind. But Reed also crossed the same black metal barricade as Fonticoba—and Reed was one of the first rioters to do so—and stormed forward. Additionally, after making it on the west plaza, Reed ran to the southwest stairs and forcefully wrestled a bike rack away from a police officer, whereas Fonticoba had no direct contact with an officer in this manner. And, although both defendants entered the Capitol building, Fonticoba entered for less than two minutes, whereas Reed remained in the building, and in critical areas, for 23 minutes. Reed also remained on Capitol grounds far longer than Fonticoba, as Reed occupied the government vehicle after he exited the building.

Although Reed's conduct was more aggravating than Fonticoba's conduct on January 6, Fonticoba's participation and leadership in the Proud Boys, which involved planning and coordination of the attack on the Capitol prior to January 6 was far more extensive than Reed's. Also, Fonticoba's known goal was to obstruct the certification proceeding and he took efforts to ensure its success, such as recruiting others to join the attack, thus amplifying his impact. Thus, a comparable, but lesser, sentence for Reed is warranted here.

In *United States v. Eckerman*, 21-cr-623 (CRC), the defendant was involved in three separate breaches of police lines inside the Capitol, including one just outside the House Chamber when members of Congress were still sheltering inside. During one breach, Eckerman pushed a police officer, causing the officer to fall on the ground and rendering the officer more vulnerable

to attack. Eckerman also entered a sensitive area—the Rayburn Conference Room—and took photographs as souvenirs. Judge Cooper sentenced Eckerman to 20 months of incarceration following his guilty plea to one count of 18 U.S.C. § § 111(a)(1).[6]

Like Eckerman, Reed was involved in several breach points. However, whereas Eckerman's breaches occurred inside the Capitol building, Reed's participation in the four breach points outside were far more pivotal in the context of the riot, because they facilitated the crowd's access to the Capitol grounds and building. And Reed's affiliation and concerted movement with the Proud Boys, which led to this initial breach near Peace Circle, is a highly aggravating factor not found in Eckerman's case. Both defendants knocked an officer to the ground, causing a serious risk of harm to the officer. Reed's conduct was more involved, however. First, he participated in four separate breach points on Capitol grounds, whereas Eckerman was not involved in any breach points outside. Second, Reed occupied a sensitive location near the Speaker's Lobby and at a particularly heightened time. Third, after he was pushed out of the Capitol, Reed remained on Capitol grounds, continuing to contribute to the lockdown state of the Capitol, on the east side of the building, for far longer than Eckerman. Fourth, Eckerman accepted responsibility in his case, whereas Reed has not. Therefore, a significantly longer sentence is warranted for Reed.

---

[6] Although Reed was not convicted of 18 U.S.C. § 111(a)(1), his conduct on the west front—specifically, at breach point four—plainly amounts to an act of assault. The government asserts that U.S.S.G. § 2A2.2 is the appropriate guideline for Count One, 18 U.S.C. § 231(a)(3), which is the same guideline that the court applied in Eckerman. Thus, given the guideline for the lead charges are the same, this is an appropriate comparator for the court. Reed's ultimate guidelines calculation is higher than Eckerman's, however, because Eckerman received credit for accepting responsibility, whereas Reed did not, and Reed was convicted of more charges at trial.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Reed was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Reed to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Reed's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VIII. FINE

Reed's convictions for violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(D) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Reed's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine. Specifically, Reed owes over $100,000 in child support arrears. PSR ¶ 76. Because of this debt, the government does not

recommend that the Court impose a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 42 months of incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $170 for his convictions.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    /s/ *Ashley Akers*
ASHLEY AKERS
Senior Trial Counsel
Capitol Siege Section Detailee
MO Bar No. 69601
601 D Street, N.W.
Washington, D.C. 20530
202-353-0521
Ashley.Akers@usdoj.gov