## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-CR-00227-JEB** |
| | ) | |
| **JEFFREY REED,** | ) | |
| | ) | |
| *Defendant* | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Jeffrey Reed, through undersigned counsel, respectfully requests the Court adopt his objections to the Presentence Report, adopt the Guideline range of 8-14 months, and sentence him at the low end of the Guidelines. Such a sentence would ensure that the Court does not create unwarranted disparity between Mr. Reed's case and other cases of individuals already sentenced for convictions under 18 U.S.C. § 231(a). Additionally, a sentence of 8 months would be sufficient but not greater than necessary and would take into account all the sentencing factors set out at 18 U.S.C. § 3553(a).

### I.    Mr. Reed's trajectory to January 6th

Mr. Reed has not made excuses for his actions on January 6th; to the contrary, he has submitted a written statement accepting responsibility and acknowledging that had he known how the events of the day were going to turn out, he would not have gone to the Capitol. PSR ¶ 29. But why did Mr. Reed associate with groups that led him to the Capitol on that day? The answer is a complex one, only briefly alluded to in the PSR.

Mr. Reed grew up in a low-income family and was raised largely by a single mother after his parents divorced when he was one year old. PSR ¶¶ 71, 73. Mr. Reed has lost two very close family members to suicide by self-inflicted gunshot wound: his father in 1996 (when Mr. Reed

was 21 years old) and his brother Christopher more recently, in 2017. PSR ¶¶ 71-72. Of all his siblings and half-siblings, Mr. Reed had been closest to Christopher.

Mr. Reed was married for almost 9 years to Cynthia, the woman who is now his ex-wife. With the arrival of their first child, Silas, Mr. Reed thought he would have a marriage and an intact family. Silas was born with severe autism. PSR ¶ 75. Everyone in Mr. Reed's family has confirmed this. Even today, at age 15, Silas remains largely non-verbal. His son's autism diagnosis and the associated struggles of raising an autistic child took an immense toll on Mr. Reed, his wife, and their marriage.

For his part, Mr. Reed was devastated by his son's condition and became desperate to understand the *why* behind his son's diagnosis. As Mr. Reed's sister Jessica explains to the Court in her letter, Mr. Reed "started a deep dive" into trying to understand what causes autism. *See* **attached letter of support** (letter from sister Jessica). Unfortunately, much of the online discussion on this topic serves as a gateway into much deeper, fringe "right-wing" beliefs and conspiracy theories. Mr. Reed was a desperate parent, as parents of children with severe autism often are. He started out as a father who wanted answers for the pain and suffering he saw in his child and couldn't understand.

Studies funded by the National Institute of Health have examined how caring for a child with autism spectrum disorder affects the parents' quality of life.

> Caring for children with autism spectrum disorders (ASDs) is challenging and affects family life. ASDs are neurological complex conditions impairing social interaction and communications, such as difficulties to respond to social interactions or deficits in understanding nonverbal communication. Moreover, persons diagnosed with an ASDs have restricted behavioral functions. Children with ASDs often exhibit more than one of these core ASD symptoms and may also suffer from associated symptoms, such as severe tantrums or sleep problems.
>
> Meeting the high care demands of affected children requires much time, effort and patience. This often results in psychological distress, depression, anxiety and other

mental or physical health problems among their parents. Moreover, many parents face financial problems, given high out-of-pocket health care expenses, underemployment or employment loss. Not surprisingly, parents of children with ASDs often feel strained by caregiving.[1]

This was certainly the case for Mr. Reed and his wife Cynthia. Their son's condition placed immense stress on their marriage. Cynthia was desperate for more money for more treatment as their son was unable to function in the traditional school system. Mr. Reed, a dedicated blue-color ironworker, began taking higher paying jobs outside of Texas to earn more money while Cynthia focused on caring for Silas's day-to-day needs. The distance wore both of them thin, and eventually led to their divorce.

Mr. Reed's ex-wife has engaged in contentious custody and child support disputes with him for years. This remains ongoing. Estrangement from family has been a theme, or recurring trauma, in Mr. Reed's life. Losing his family, as Mr. Reed will admit, caused him to search for belonging, for a group, for a replacement "family" in his life. Mr. Reed didn't go searching to become a member of a group that would lead him to the events of January 6th. He was a desperate and confused father who had lost his family and was searching for answers and belonging in his life. He fit the profile of so many who are vulnerable to persuasion from fringe conspiracy theories and online recruitment efforts.

## II.    The government trumps up Mr. Reed's role in the Proud Boys/Three Percenters and inaccurately claims he was involved in "planning."

Following the events of January 6th, FBI agents sought out a member of the Hudson Valley Proud Boys—the same group Mr. Reed was in—to glean information about the HVPB's plans for January 6th and the roles individual members played in the group. The individual interviewed,

---

1 Renske Hoefman, Payakachat, van Exel, Kuhlthau, Kovacs, Pyne and Tilford, "Caring for a Child with Autism Spectrum Disoder and Parents' Quality of Life," Journal Autism Dev. Disorder, August 2014, p. 1933-1945. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4167350/

Christian Belena, was present and participated in all the same action Mr. Reed did. Indeed, Belena was an individual who featured prominently in the videos and photos the government played at Mr. Reed's trial.[2]  Mr. Belena was near Mr. Reed or in front of him through much of the initial progress up the walkway and reached the bike rack area before Reed:



Belena clearly moved bike racks:



---

2 These images come from Gov't trial exhibit 511.



Belena yelled at officers:



And Belena walked through the Capitol:



Though Mr. Belena appeared to engage in the same or worse conduct than Mr. Reed on the walkway (clearly moving multiple bike racks with much gusto), the government has never charged him with any offense for his conduct on January 6th. Instead, the government located Belena and FBI agents interviewed him on January 25, 2022. Belena agreed to provide information on all the members of the Hudson Valley Proud Boys, including Mr. Reed.[3]

Mr. Belena told FBI agents that "the motives for HVPB's January 6 attendance was not what ultimately ended up happening."[4] He further stated:

---

3 This debrief was memorialized in a fifteen-page FD-302 report and was provided to defense counsel in discovery. Counsel can provide the entire document at the court's request.
4 FBI-302, Interview of Christian Belena.

```
BELENA said there was no plan for violence on January 6 among the HVPB
members.  BELENA had seen George and Capt. Crunch post some rhetoric online,
but by and large, most of HVPB wasn't out looking for violence. [Agent
Note:  Capt. Crunch is BRIAN FONDONELLA]  According to BELENA, HVPB went as
a counter to ANTIFA and to support President Trump.  There was no plan to
attack Congress, or take any hostages.  BELENA was not aware of any plans
for a coup.

BELENA felt HVPB's overall goal with January 6 attendance was to counter
ANTIFA and protest the actions of Congress.  BELENA was unsure who made the
call to go to the Capitol and push into the building.  BELENA felt  the
moving barricades was organic and not something that was pre-planned.
```

Additionally, when Belena was shown a photo of Mr. Reed and asked about Mr. Reed's specific role in the HVPB group, he described Mr. Reed as an "oddball" and a "big-time drunk." Mr. Reed played no organizational role or leadership role and the government's contention that Mr. Reed "coordinated with other Proud Boys" in any kind of organizational capacity is baseless and contraindicated by all of the discovery in this case. Even in the messages the government cites from Mr. Reed in the Telegram group chat (of 60+ members), Mr. Reed laments the *lack of* plan and the fact that he feels left out of the group. Mr. Reed does not deny that he was a member of the HVPB and Three Percenters at the time of the offense, but he did not play any role in organizing, coordinating, or even motivating others around the events of January 6th.

As Mr. Reed stated clearly in his written acceptance of responsibility statement: he did not know that January 6th was a day that was going to turn out the way that it did and, had he known how the day was going to turn out, he would not have gone. PSR ¶ 29.

III.    **Mr. Reed's conduct on January 6th does not warrant an above-Guideline sentence. To sentence him as the government requests would create radical disparity between Mr. Reed and similarly situated individuals.**

The Court presided over the bench trial in this case and is familiar with the facts of Mr. Reed's offense. The government's request for a dramatic upward variance to a sentence double the high end of the Guidelines set out in the PSR would create total disparity in sentencing. The

government points to no compelling reason to treat Mr. Reed's case differently from other § 231 cases.

Indeed, in reviewing sentencing outcomes of individuals sentenced for § 231(a)(3) convictions, even including those who also have a § 111 assault conviction, counsel is hard pressed to locate any case in which the district courts have upwardly varied. Across the board, the courts have given Guideline or below-Guideline sentences. In almost all cases, those sentences have fallen well below the government's sentencing requests, the exceptions being where the government requested a guideline sentence at the outset. The courts have across-the-board rejected government requests for upward variances.

There is simply no compelling reason to treat Mr. Reed's case as an outlier. Some points of comparison for the Court to consider include:

1. In *United States v. Young*, No. 21-cr-617, Judge Friedrick sentenced Mr. Young to 8 months incarceration after he pleaded guilty to seven counts, including a § 231(a) civil disorder charge *and assault* in violation of 18 U.S.C. § 111(a)(1). According to the government's sentencing memorandum, Mr. Young was one of several rioters who "lifted and pushed a metal bicycle rack barricade into a wall of officers" and later "attacked another line of officers in the same location." ECF No. 35 at 2. In addition to assaulting officers, Mr. Young tried to "sabotage law enforcement" by letting "the air out of the tire of a government vehicle." *Id.* The government recommended 40 months' imprisonment. Even so, the court sentenced Mr. Young to a sentence of 8 months' incarceration.

2. In *United States v. Jackson*, No. 22-cr-230, Judge Contreras sentenced Mr. Jackson to "36 months probation with conditions," *see* Min. Entry (Mar. 21, 2024), even though his conduct was far mor violent and assaultive than Mr. Reed's. According to the government's

sentencing memorandum, Mr. Jackson was near the tunnel of the Capitol where he "hurled a large cone at the officers," and then, "using a stolen police shield, and with a running start, he rammed the frontline of officers, causing two of them to fall." ECF No. 80 at 2, *see also id.* at 12-15 (showing images of the clash). Mr. Jackson was charged with six counts, including civil disorder in violation of § 231(a)(3) *and assaulting* an officer with a dangerous weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b) as well as various misdemeanor offenses. He pleaded guilty to assault. The government asked for 41 months' imprisonment at sentencing; the court sentenced Mr. Jackson to 36 months' *probation* with conditions.

3. In *United States v. Capsel*, No. 22-cr-107, Judge Chutkan sentenced Mr. Capsel to 18 months incarceration, though the government asked for 31 months and the Guidelines recommended 27-33 months. According to the government's sentencing memorandum, Mr. Capsel "was at the front line of the mob ascending the stairs to the inauguration bleachers" and "was part of a group of rioters who pushed against a police line on the Northwest side of the Capitol." ECF No. 67 at 2. The government also located footage of Capsel pushing against officers after Capsel pleaded guilty, which the government characterized as an assault in its sentencing filings. *Id.* at 9-10. According to the government, Capsel also heavily used social media both pre-, during, and post- January 6th to post incendiary statements and videos to rile up his followers, and he stayed on the grounds much longer than others that day. Capsel pleaded guilty to a § 231(a)(3) violation and was sentenced to 18 months incarceration.

4. In *United States v. Ronnie Presley*, No. 21-cr-257, Judge Moss sentenced Mr. Presley to 12 months' incarceration. The government had requested 16 months' incarceration and, in

its sentencing memorandum, argued that Mr. Presley, who was a convicted felon and on felony probation for an assault conviction on January 6th, entered the Capitol through the Upper West Terrace door very soon after the initial breach of the building and "only two minutes after that particular door was breached." ECF No. 52 at 6-8. Presley confronted officers in the Rotunda directly and repeatedly, for a total of eight times, and eventually an officer had to deploy a chemical irritant against him. *Id.* at 13-15. Undeterred, Presley re-engaged with officers at the doorway and pulled on an officer's shield to attempt to wrest it from him. Presley pleaded guilty to a § 231(a)(3) violation and was sentenced to 12 months' incarceration. The Guidelines were 10 to 16 months, and the government requested a high-end (16 month) sentence.

5. In *United States v. Sargent*, No. 21-cr-258, Judge Jackson sentenced Mr. Sargent to 14 months' incarceration, despite the government recommendation of 27 months. The Guidelines were 24-30 months. According to the government's sentencing memorandum, Mr. Sargent scaled scaffolding on the Capitol's West Plaza, made his way to the front of the crowd that had broken the police line and forced officers to begin retreating to the Lower West Terrace, and assaulted an unknown Capitol police officer. ECF No. 70 at 2. Video footage showed Mr. Sargent swing his open hand at a USCP officer and make physical contact. *Id.* at 11. He later bragged in a video about having "duffed a cop in the face." *Id.* at 15. Sargent pleaded guilty to both a § 231(a)(3) civil disorder charge *and assault* in violation of § 111(a)(1), as well as four misdemeanor offenses. He received a sentence 10 months *below* the low end of the Guidelines, for a total period of incarceration of 14 months.

6.  In *United States v. Steele*, No. 21-cr-028, Judge Mehta sentenced Ms. Steele to 12 months and 1 day of imprisonment and 6 months of home detention as a condition of supervised release, after she was convicted *at a jury trial* of seven counts, including conspiracy to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k), tampering with document charges, and a § 231(a)(3) civil disorder charge. According to the government's sentencing memorandum, Ms. Steele drove from her "residence to the D.C. area with two handguns" and "eventually equipped herself with an Oath Keepers shirt, tactical vest, and other gear," before she "joined the stack of Oath Keepers that breached the Capitol." ECF No. 1024 at 53. She "confronted and pushed against police officers" and, after January 6th, burned all her gear to "destroy the trail of evidence." *Id.* at 53. The Guideline range was 97-121 months. Ms. Steele was sentenced to 12 months and 1 day, plus 6 months' home detention as a condition of supervised release.

7.  In *United States v. Baquero*, 21-cr-702, this Court sentenced Mr. Baquero to 18 months imprisonment, a downward variance from the Guideline range of 24-30 months and the government's requested sentenced of 27 months. According to the government's sentencing memorandum, Mr. Baquero walked over fallen barricades into the Capitol while sirens were clearly blaring, confronted police officers by yelling "traitor" in their faces, grabbed the hand of an officer holding a baton, and stayed in the Rotunda as long as possible while resisting USCP efforts to expel protestors. ECF No. 48 at 2. Baquero also pushed against the door as officers tried to close it and, all told, had three physical confrontations with officers. *Id.* at 20. The government advocated for a 27-month sentence on a 24-30 month Guideline range (a higher range than Mr. Reed's range here). This Court sentenced Mr. Baquero to 18 months' imprisonment.

8.  In *United States v. Munafo*, No. 21-cr-330, this Court sentenced Mr. Munafo to 33 months imprisonment. The government requested a high-end sentence of 37 months (the range was 30-37). In its sentencing memorandum, the government described Mr. Munafo as an individual with a "long series of violent offenses," a lengthy criminal record and a "criminal history demonstrate[ing] a propensity towards violence, especially towards strangers and authority figures." ECF No. 48 at 24. On January 6th, Mr. Munafo attacked police officers in the Tunnel, one of the sites of the most violent conduct that day, punched an MPD officer, and stole the officer's riot shield. *Id.* at 3. Mr. Munafo also commandeered a flagpole and used it to strike windows of the Capitol several times. *Id.* Mr. Munafo had a lengthy criminal history, including a federal felony conviction for interstate threatening communications. *Id.* at 21. The Court declined to grant a high-end Guideline sentence and instead sentenced Mr. Munafo to 22 months imprisonment. Mr. Munafo's conduct—and criminal history—was significantly more assaultive and violent than Mr. Reed's. Munafo's case highlights how the government's requested upward variance request for a sentence of 42 months in Reed's case would create unwarranted disparate sentencing outcomes.

9.  In *United States v. Carpenter*, 21-cr-305, this Court sentenced Ms. Carpenter to 22 months incarceration. The applicable Guidelines in the case were 57-71 months and the government requested a 66-month sentence. Ms. Carpenter was convicted *at a jury trial* of the § 231(a)(3) civil disorder charge, the § 1512 charge, and five misdemeanor offenses. Ms. Carpenter, a former NYPD officer, breached the West Front of the Capitol, made her way up the inaugural stage, and entered the Upper West Terrace through exit doors. ECF No. 113 at 2 (Gov't Sentencing Memo). According to the government's sentencing memorandum, Ms. Carpentar "rallied other rioters" by shaking a tambourine and then

started screaming at officers, even making physical contact with an officer with her tambourine. *Id.* Despite the high Guideline range in the case and Ms. Carpenter's decision to exercise her right to a jury trial, the Court varied downward, well below the government's requested 66-month sentence, and sentenced Ms. Carpenter to 22 months' imprisonment.

10. In *United States v. Beckley*, 21-cr-285, this Court sentenced Mr. Beckley to 18 months' imprisonment, a downward variance from the Guideline range of 30-37 months. The government requested a sentence of 37 months, the high end of the Guideline range. In its sentencing memorandum, the government noted that Mr. Beckley entered the Capitol early on, at 2:27 p.m., "just minutes after the door's initial breach." ECF No. 89 at 2. He remained in the Capitol for over an hour and even re-entered after exiting, in clear violation of officers who were actively attempting to clear the building. *Id.* Beckley engaged in multiple, heated exchanges with officers and actively physically resisted their efforts to remove him from inside the Capitol. *Id.* The government also noted Mr. Beckley's "lack of remorse" for his actions in his interview with news media outlets. *Id.* Mr. Beckley was convicted at a stipulated bench trial of § 231(a)(3) civil disorder and a § 1512 violation. This Court varied down from the Guidelines and sentenced Mr. Beckley to 18 months' imprisonment.

11. In *United States v. Krill*, 23-cr-342, this Court sentenced Mr. Krill to 9 months' imprisonment, a downward variance from the applicable Guideline range of 10-16 months. The government requested a 13-month sentence. According to the government's sentencing memorandum, Mr. Krill was one of the early participants on January 6th, making his way to the Capitol grounds at 1:30 p.m. ECF No. 34 at 3. Mr. Krill grabbed a bike rack

barricade from directly in front of an officer, pulled the barricade away from the officer holding on to it, and, in dislodging the barricade, allowed a group of protestors to push into the officers. *Id.* at 4-5. As Mr. Krill climbed up the West side of the Capitol, past inaugural scaffolding, he posted videos to his TikTok account. *Id.* at 5. Mr. Krill entered the Capitol and remained in the Rotunda for 47 minutes (almost twice as long as Mr. Reed) and resisted police attempts to remove him from the room (unlike Reed, who neither engaged with officers nor disobeyed officers' orders inside the Capitol). *Id.* at 8-9. Mr. Krill pleaded guilty to a § 231(a)(3) charge and faced a Guideline range of 10-16 months. This Court sentenced him to 9 months' imprisonment.

12. In *United States v. Willard Purkel*, 23-cr-448, this Court sentenced Mr. Purkel to 60 days imprisonment, a downward variance from the Guideline range of 8-14 months and the government's requested 8-month sentence. In its sentencing memorandum, the government highlighted that Mr. Purkel, along with his son, was involved in a "protracted fight to enter the Capitol." ECF No. 53 at 2. Despite law enforcement attempts to evacuate rioters, Purkel "shoved his way inside," "rushed to the doors of the Capitol Rotunda," "joined the scrum" inside, and joined a group that "successfully shoved the police to one side and entered." *Id.* Purkel took a "defiant selfie" before being forced out of the building. *Id.* He then "climbed on top of an armored government vehicle." *Id.* Notably, Mr. Purkel appears to have climbed atop the same government vehicle that Mr. Reed did:


*Image 14: Purkel atop an armored truck*

This Court sentenced Purkel to 60 days imprisonment, a sentence below the 8-14 month Guideline range, after he pleaded guilty to the § 231(a)(3) civil disorder charge and four misdemeanor offenses.

The Government exaggerates the severity of Mr. Reed's conduct in comparison to others' that day. The Court has seen numerous cases. And the Court presided over Mr. Reed's bench trial and heard and saw all the evidence. As the Court will recall, Mr. Reed was largely silent on January 6th. The Court watched video—and heard testimony from officers about that video footage—showing that Mr. Reed indeed walked calmly through the Capitol, did not yell, scream, chant, or even appear to speak. He walked from one side of the Capitol to the other. He did not, as the government claims, "move directly to secure locations of the building." He walked in one side and out the other. He exited in approximately 20 minutes. He did not engage with the crowd inside nor did he engage with any officers inside. Indeed, USCP witnesses at Mr. Reed's trial testified that he appeared silent, alone, and compliant with officer directives in CCTV footage.

While in the Capitol, Mr. Reed was one of the individuals who was near the location where Ashley Babbitt was shot and killed. Mr. Reed, after seeing this, walked out of the Capitol and shredded a Blue Lives Matter flag. Notably, Mr. Reed had previously attended *pro* Blue Lives

Matter rallies. It is a fair conclusion to draw from this evidence that witnessing a protestor shot by police challenged Mr. Reed's longstanding views of law enforcement in the heat of that moment. Unlike the majority of the case outcomes cited above, Mr. Reed exited the Capitol quickly and of his own accord with no contact or urging of law enforcement officers.

The government's request for an upward variance to a sentence almost double the Guidelines calculated in the PSR is extreme and unwarranted on the facts of this case.

### IV. The PSR applies the correct guideline and the Court should reject the government's urging to apply the aggravated assault guideline, which does not apply in this case.

The PSR correctly applies USSG § 2A2.4 (Obstructing and Impeding Officers) as the applicable guideline for the civil disorder conviction. The government incorrectly contends that § 2A2.2 (Aggravated Assault) is the correct guideline. Because there is no basis to apply the aggravated assault guideline in Mr. Reed's case, the Court should adopt the correctly stated guideline in the PSR and reject the government's argument.

The PSR correctly considered the facts of this case and the offenses of conviction and applied USSG § 2A2.4. The government now seeks to backdoor in an aggravated assault case that it never brought against Mr. Reed and never tried before this Court.

Mr. Reed was not charged with assault. USSG § 2A2.4(c) requires a defendant convicted of assaulting a federal officer under 18 U.S.C. § 11 be sentenced under § 2A2.2, only if the defendant's conduct constituted *aggravated assault*. The commentary to the aggravated assault guideline defines "aggravated assault" as

> a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. Cmt 1.

16

The government does not argue that subsections (A), (B), or (C) apply. Instead, the government raises its argument under ground (D). The evidence at trial nowhere established that Mr. Reed assaulted an officer much less that he assaulted an officer with an intent to commit another felony.

Mr. Reed was neither charged with nor convicted of assault. At the bench trial, this Court did not find that Mr. Reed committed an assault. With respect to breach point four, the only point at which the government argued that Mr. Reed physically engaged with an officer in any way, "the Court found that '[D]efendant was yanking and pulling on the bike rack by the inaugural stage and that such actions were clearly interfering or were impeding law enforcement officers who were attempting to maintain those racks.'" ECF No. 62 at 3 (Memorandum Opinion).

Further, the Court made no finding that Mr. Reed possessed the *mens rea* element that would have been required for the government to prove an assault charge. The court did not find Mr. Reed intentionally assaulted an officer. The Court did not find that an assault occurred at all. The Court's findings of fact were that Mr. Reed "yanked and pulled on a bike rack" "with the intent to obstruct officers." *Id.* at 3-4. The Court made no finding that any direct physical contact occurred. The object of Mr. Reed's "tug of war over a bike rack" was, under the Court's findings, to obstruct the officers' efforts to maintain the bike rack barricade *not* to assault an officer.

Because there was no evidence and no finding that Mr. Reed intentionally assaulted an officer with the intent to commit another felony, the Court should decline the government's request to apply USSG § 2A2.2. The PSR is correct as written; USSG § 2A2.4 applies to Mr. Reed's conduct.

**V.    Whether the Court applies the 2-level Zero-Point Offender reduction or not, Mr. Reed has no scoring criminal history and should be viewed—and sentenced—through that lens.**

The PSR denies Mr. Reed the zero-point offender reduction. Mr. Reed has objected in writing. Mr. Reed has zero criminal history points and should qualify for the two-level downward adjustment under USSG § 4C1.1. The Commission promulgated the Zero-Point Offender provision in recognition of the low recidivism rates of first-time offenders and in response to the Congressional directive "that alternatives to incarceration are generally appropriate for first time offenders not convicted of a violent or otherwise serious offense." Amendments to Sentencing Guidelines (April 27, 2023) at 78-80. Even if the Court does not grant Mr. Reed's objection to the PSR on this point, the Court should view him as the type of offender the Commission had in mind when it promulgated this guideline. There is no evidence that Mr. Reed—now two months shy of his 50th birthday—is likely to reoffend.

**VI.    Mr. Reed's performance on bond reveals his capacity to abide by Court rules and to follow the law going forward.**

Mr. Reed has been under court supervision on conditions of release since June 2023. He has been on GPS location monitoring the entire time and has had no violations of his conditions. Mr. Reed is a hard worker; he works outdoors welding high rise buildings in the Austin area through 100+ degree heat. He has been an ironworker and a member of the ironworkers union for over 20 years. His employer was interviewed in connection with preparation of the PSR and gave him rave reviews as an employee. PSR ¶ 105.

The government claims Mr. Reed has not expressed remorse or contrition for his actions on January 6th. This is not true. Mr. Reed wrote a statement accepting responsibility, as reflected in the PSR at Paragraph 29. He clearly stated he did not go to the Capitol intending to cause harm and he states he is sorry for contributing to the harm caused. Further, Mr. Reed reflects that had he

knows January 6th was going to turn out as it did, he would neither have gone nor participated. Mr. Reed's written statement is an appropriate and considered expression of remorse.

Additionally, as the government correctly notes, Mr. Reed is no longer associated with any Proud Boys faction or Three Percenter group. After January 6th, Mr. Reed was blacklisted at his union hall in New York. He lost work. He and his partner moved to Texas so he could continue to work as an ironworker and maintain his longtime, blue-collar career. Mr. Reed moved out of New York—and left the Proud Boys and Three Percenters—well prior to the initiation of this case. Indeed, the government did not bring charges against Mr. Reed until June of 2023, over two years after the events at issue. Mr. Reed was already in Texas and had already left any groups he was in when he lived in upstate New York.

Mr. Reed's voluntary actions in disassociating from the group—well before he ever had law enforcement contact or faced criminal charges—are good evidence for the Court to consider of Mr. Reed's remorse.

Finally, it is relevant for the Court to know that Mr. Reed is currently taking affirmative action to sort out his child support obligations in Texas. The Texas Attorney General recommends parents make child support payments through an online portal so the State can directly track such payments. Part of the reason Mr. Reed appears in arrears is because he has always made payments directly to his ex-wife. Mr. Reed is not a sophisticated man, especially when it comes to legal obligations and paperwork. However, undersigned counsel learned that Mr. Reed recently took counsel's suggestion and sought out appointed counsel on his child support case. In speaking with Mr. Reed's appointed counsel in the child support matter, she understands that Mr. Reed indeed has kept track of his payments and a hearing has been scheduled for February 25, 2025, in Texas where Mr. Reed, now represented by counsel, hopes to address any outstanding concerns related

to his child support obligations. If this Court imposes a sentence of incarceration, Mr. Reed respectfully requests the opportunity to self-surrender so that he may make his scheduled court appearance on his child support matter before entering federal custody.

### VII.    Conclusion

The PSR calculates the Guidelines in this case at 18-24 months. Mr. Reed has filed several objections. Mr. Reed asks the Court to grant his objections submitted via ECF on December 6, 2024. If the Court sustains Mr. Reed's objections, the applicable Guidelines would be 8-14 months. Mr. Reed requests a sentence at the low end of that Guideline range or, at most, a term of imprisonment of 12 months and 1 day. Such a sentence would situate Mr. Reed's case among comparable cases that have already been sentenced and would reflect a sentence sufficient but not greater than necessary to satisfy the sentencing factors of 18 U.S.C. § 3553(a).

Respectfully submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender


_____/s/_____
CHARLOTTE A. HERRING
Assistant Federal Public Defender
Western District of Texas
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025

**CERTIFICATE OF SERVICE**

I, Charlotte Anne Herring, Assistant Federal Public Defender for the Western District of Texas, hereby certify that on the 16th day of December 2024, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

_____

/s/  CHARLOTTE ANNE HERRING

# Letter of Support

Your Honor,

First, thank you for taking your time to read this character letter about my brother Jeff Reed. My name is Jessica Peters and I am Jeff Reeds half sister. Our father Dan Reed was active in his parental role and followed the standard custody agreement with Jeff's mother Suzan. Although my father did suffer from mental illness my half brothers were hidden from this. Growing up I can remember Jeff as an extremely mellow guy who enjoyed friends and skateboarding. He was never a leader type and not a follower either. He seemed to just want peace, like a hippie at heart, if that makes sense.

I recall him eventually getting married to Cynthia, the mother of his children. Their first child Silas was diagnosed with autism and that started a deep dive into what causes autism. I specifically recall having conversations with Jeff about the cleanliness of our water and lead in our foods. Jeff moved away to make money for his family, so that Cynthia could be with their two children. Jeff moved to New York in a remote area and his research led him to become interested in living more naturally and growing your own food and he found a group. Unfortunately, Cynthia decided she was lonely and found love elsewhere (excuse my bluntness, but with another woman). Then our oldest brother Chris committed suicide, just like our dad did. So, Jeff became more ingrained in this group that seemed innocent at first, just trying to live healthy, but it turned into following the quanon rabbit hole. This led to the idea of trump draining the swamp and that led to the very poor choice of attending the insurrection.

Your honor, when I tell you our family was surprised I mean we were shocked. Since that incident I have 2 sons who have been diagnosed with autism and a cousin. So, for our family at least it seems it is just a genetic factor. Within the last 4 months I have spoken with Jeff about the insurrection incident and he says he doesn't know why he did that and that he doesn't blame anyone, but himself for his actions that day.

He also said he would not do that again. I did watch a YouTube video about Jeff that said he was the leader of a group and had a weapon. I know my brother and he is not dangerous, but I can definitely see how the pictures or videos made him look. He has an incredibly huge conscience and would never hurt anyone. I personally want to blame quanon or even trump for the poor influence over people thinking, but we all are responsible for our own choices. I'm thankful my brother does see that because he won't be caught of guard again.

Thank you again for your time and I pray that your heart will be softened towards the people that were led astray.

Sincerely,
Jessica Peters
713-382-6287